**IN THE DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BANK OF MINGO,**

    **Plaintiff,**

v.

**Case No.:** ___2:24-cv-00262___
**Judge:** _____

**EVEREST NATIONAL INSURANCE COMPANY,**

    **Defendant.**

## COMPLAINT

COMES NOW Plaintiff, Bank of Mingo ("Bank"), by counsel, and for its Complaint against Defendant, Everest National Insurance Company ("Everest"), alleges as follows:

### JURISDICTION AND VENUE

1. Plaintiff, Bank of Mingo, is a West Virginia corporation with its principal place of business at Williamson, West Virginia.

2. Upon information and belief, Defendant, Everest National Insurance Company, is an entity incorporated in New Jersey that engages in the business of insurance in West Virginia with its principal place of business at 100 Everest Way, Warren, New Jersey.

3. This Court possesses federal jurisdiction under 28 U.S.C. § 1332 because complete diversity exists amongst the parties and the amount-in-controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

4. This Court possess venue under 28 U.S.C. § 1391 because the acts giving rise to the events alleged in this Complaint occurred in this judicial district.

### FACTUAL ALLEGATIONS

5. The Bank realleges paragraphs 1-4 as if set forth and fully incorporated herein.

6. This civil action relates to a Directors & Officers Liability Policy, Policy No. 8100003840-121, issued by Everest to the Bank for the policy period of November 12, 2012, to November 12, 2013 ("Everest Policy").

7. On or around February 19, 2013, the Bank was the subject of a search warrant dated February 19, 2013, which sought documents relating to one of the Bank's customers, Aracoma Contracting LLC ("Aracoma"). This search warrant included the seizure of Darrin McCormick and Pam Milum's work computers. At that time, Mr. McCormick, served as the Bank's branch manager at the Bank's Williamson's branch location, and Ms. Milum served as Mr. McCormick's assistant.

8. On or around March 8, 2013, the U.S. Attorney's office sent correspondence to the Bank and Mr. McCormick concerning a federal criminal investigation into the Bank and its employees' banking practices ("McCormick Investigation").

9. Shortly thereafter, the Bank, through counsel, met with the Federal Deposition Insurance Corporation ("FDIC"), wherein the FDIC demanded that the Bank fire Mr. McCormick and put its insurance carrier and fiduciary bond carrier on notice, both of which the Bank did.

10. On or around April 24, 2013, the Bank, through counsel, provided written notice to the Bank's insurance agent concerning the McCormick Investigation. The Bank advised in that written notice that the pending criminal investigation was to determine whether the Bank and/or Mr. McCormick should have known that Aracoma engaged in a scheme to avoid the filing of Currency Transaction Reports ("CTRs") and/or that the Bank and/or Mr. McCormick were complicit in Aracoma's unlawful scheme.

11. On May 7, 2013, the Bank, through its counsel, notified Everest of the McCormick Investigation and placed Everest on notice of the claim under the Everest Policy with information then available to the Bank ("Claim").

12. Several months later, on September 13, 2013, Everest, through its adjuster Peter Hilbert of ABA Insurance Services, Inc. ("ABAIS"), advised the Bank that Everest reviewed the notice of the Claim sent by the Bank.

13. In his September 13, 2013 correspondence, Mr. Hilbert advised the Bank that Everest had spoken with Mr. McCormick and learned that no indictments had been returned for either Mr. McCormick or the Bank. Mr. Hilbert concluded the letter by denying the Bank's Claim because a "Claim" under the Everest Policy is defined, in relevant part, as "a criminal proceeding commenced by the return of an indictment." Even though Everest through Mr. Hilbert and ABAIS denied the Claim, Mr. Hilbert acknowledged that a grand jury had been empaneled for the McCormick Investigation.

14. Subsequently, Mr. Hilbert spoke with Mr. McCormick's counsel on or around October 28, 2013, and confirmed that, at that time, no charges had been brought against Mr. McCormick or the Bank.

15. All the while, the DOJ, IRS, FBI, FDIC, FINCEN, the West Virginia State Police, the West Virginia Insurance Commission, and other authorities continued to investigate, and subsequently, bring charges and other claims, against the Bank, its management, and/or directors.

16. The Bank, at its own expense, indemnified Mr. McCormick's defense costs incurred by his retention of the law firm of Carey, Douglas, Kessler & Ruby PLLC arising from McCormick Investigation in a criminal case styled, *United States of America v. Darrin*

*McCormick*, Case No. 2:14-00081, filed in the United States District Court for the Southern District of West Virginia, at Charleston.

17. The Bank, at its own expense, indemnified Michael Brewer, the Bank's Banking Secrecy Act ("BSA") officer at relevant times, for his defense costs incurred by his retention of the law firm of Jenkins Fenstermaker, PLLC to represent him in a proceeding brought by the FDIC in 2016 styled *In the Matter of Robert Michael Brewer, individually, and as an institution-affiliated party of Bank of Mingo Williamson, West Virginia*, No. FDIC-15-0284e. The FDIC brought this proceeding against Mr. Brewer alleging that Mr. Brewer participated in violations of the BSA during his tenure as the Bank's BSA officer as a result of the McCormick Investigation. The Bank stopped indemnifying Mr. Brewer for his defense costs associated with the retention of Jenkins Fenstermaker, PLLC after the Bank terminated the employer-employee relationship with Mr. Brewer.

18. The FDIC also commenced an investigation into the Bank's outside directors concerning the alleged BSA violations, which arose directly from the McCormick Investigation. The Bank indemnified its outside directors for their defenses costs incurred by the retention of the law firm of Arnold Poter Kaye Scholer LLP to represent the outside directors in the FDIC action relating to alleged BSA violations.

19. The Bank further indemnified Mr. McCormick, Mr. Brewer, and the Bank's outside directors by paying for Arnett, Foster & Toothman to conduct a "look-back" audit of the Bank's banking practices. Mr. McCormick, Mr. Brewer, and the Bank's outside directors utilized the "look-back" audit to defend against the various civil, criminal, and/or regulatory actions brought against those individuals.

20. With widespread investigations into various of the Bank's management and directors, the Bank further indemnified Mr. McCormick, Mr. Brewer, and the Bank's outside directors by covering the defense costs of Bowles Rice LLP, which was retained to coordinate the Bank's investigation and coordinate the defense of the Bank's management and directors across the various investigations and proceedings.

21. On or around May 23, 2019, the Bank, through counsel, wrote to Everest about the Claim and provided additional information about the status of the various investigations, criminal charges, and/or administrative/regulatory claims, including the amount of defense costs indemnified by the Bank on behalf of its management and directors.

22. In response, Everest, through its adjuster John Cullen of ABAIS, asked the Bank to provide Everest with additional documents and invoices, which Everest claimed it needed to fully adjust the Bank's Claim.

23. On or around November 10, 2021, the Bank, through counsel, provided Everest with copies of defense cost invoices indemnified by the Bank and advised that the Bank could not readily provided line itemized defense cost invoices from the various law firms retained to represent the Bank's directors and management due to concerns with attorney-client privilege, as those firms represented the Bank's directors and management—and not the Bank.

24. At the time of the November 10, 2021 correspondence from the Bank to Everest, the Bank demanded that Everest reimburse the Bank for the defenses costs incurred on behalf of the Bank's directors and management under the Everest Policy.

25. Subsequently, Everest retained counsel, and on or around January 14, 2022, Everest, through counsel, finally responded to the Bank's November 10, 2021 correspondence.

26.     Everest's January 14, 2022 correspondence contained Everest's coverage positions for the Bank's Claim under the Everest Policy.  Among other things, Everest advised the Bank as follows:

(a) That while Mr. McCormick's portion of the Claim might be covered under the Everest Policy, the Bank failed to provide timely notice to Everest and failed to provide detailed line itemized defense cost invoices from the law firm representing Mr. McCormick for their review.  Everest asked that the Bank provided the requested information.

(b) That it appeared that no coverage existed under the Everest Policy for the portions of the Bank's Claim relating to Mr. Brewer and the outside directors because the Bank allegedly failed to comply with the notice requirements set forth in the Everest Policy.  Everest asked that the Bank provide additional information concerning Mr. Brewer and the outside directors, including all line itemized defense cost invoices from the various law firms that represented Mr. Brewer and the outside directors.

27.     While the Bank sought to comply with Everest's difficult, and unnecessary, request for further information, on August 29, 2023, the Bank and Everest entered into a Tolling and Suspension of Limitations Agreement that was effective from August 29, 2023, through May 17, 2024, and tolled all running statutes of limitations during that time.

28.     On January 18, 2024, after expending tremendous efforts to secure the information requested by Everest—most of which was protected by attorney-client privilege and inaccessible to the Bank—the Bank provided all requested information to Everest and, again, demanded that Everest comply with its obligations under the Everest Policy and reimburse the Bank for covered losses under the Policy, including the defenses costs indemnified by the Bank for its management and directors.

29. On May 14, 2024, Everest denied coverage and refused to pay the Claim or otherwise offer to settle the Claim.

## COUNT I – DECLARATORY JUDGMENT

30. The Bank realleges paragraphs 1-29 as if set forth and fully incorporated herein.

31. 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure allow this Court to declare the rights of interest parties.

32. The Bank disputes Everest's coverage determination and failure to provide any insurance coverage for the aforementioned Claim, despite the fact that the Bank paid Everest premiums under the Everest Policy as a first-party insured.

33. Everest issued the Everest Policy to the Bank wherein Everest agreed to reimburse the Bank for any covered Loss, i.e., Defense Costs incurred by Insured Persons, such as the Bank's directors and management, arising from Wrongful Acts or Interrelated Wrongful Acts that cause a Claim.

34. Despite the Bank indemnifying the Defense Costs of Insured Persons, like Mr. McCormick, Mr. Brewer, and the Bank's outside directors, and the Bank timely making a Claim for its Loss, Everest has refused, and continues to refuse, to afford any coverage or reimburse the Bank for a single penny of its Loss under the Everest Policy.

35. The Bank contends that its Loss under the Everest Policy should be covered under the Everest Policy notwithstanding the false and wrongful position taken by Everest.

36. A real controversy exists as to insurance coverage issued by Everest for which the Bank now seeks a declaration of rights under the subject insurance policy.

## COUNT II – BREACH OF CONTRACT

37. The Bank realleges paragraphs 1-36 as if set forth and fully incorporated herein.

38. The Everest Policy constitutes a binding contract between the Bank and Everest.

39. Under the Everest Policy, Everest possessed a contractual obligation to pay the Bank for its Loss resulting from Claims against Insured Persons under the Policy for Wrongful Acts.

40. Under the Everest Policy, Everest possessed a contractual obligation to timely adjust and pay the Bank's Claim when Everest's liability under the Everest Policy was apparent.

41. Everest breached the Everest Policy when it denied the Bank's Claim on September 13, 2013, and when it failed to reasonably and timely investigate the Claim after September 13, 2013, when Everest knew the McCormick Investigation was still underway and such investigation might implicate coverage under the Everest Policy. Everest further breached the Everest Policy through its May 14, 2024 denial of coverage and refusal to pay the Claim.

42. To date, despite the Bank being entitled to insurance proceeds under the Everest Policy, Everest has breached, and continues to breach, the Everest Policy because it has failed to timely accept or otherwise offer to settle the Bank's Claim in accordance with the terms and conditions set forth in the Everest Policy and wrongfully denied coverage.

43. Everest's breach of the Everest Policy has caused, and continues to cause, the Bank to incur damages because the Bank paid the Defense Costs of Insured Persons under the Everest Policy, and the Policy requires that Everest reimburse the Bank for such Loss, but Everest has refused, and continues to refuse, to do so.

**COUNT III – COMMON LAW BAD FAITH AND *HAYSEEDS* CLAIM**

44. The Bank realleges paragraphs 1-43 as if set forth and fully incorporated herein.

45. Through Everest's actions described herein, its refusal to pay the Bank for its covered Loss under the Everest Policy, and its intentional delay in handling the Claim, Everest has

8

breached its common law duty of good faith and fair dealing to the Bank, such that its conduct amounts to "common law bad faith."

46. Everest's refusal to accept the Claim and make payment to the Bank under the Everest Policy has required the Bank to vindicate its rights under the Everest Policy by retaining counsel and filing this lawsuit.

47. Under West Virginia law, when "a policyholder substantially prevails in a property damage suit against its insurer, the insurer is liable for: (1) the insured's reasonable attorneys' fees in vindicating its claim; (2) the insured's damages for net economic loss caused by the delay in settlement, and damages for aggravation and inconvenience." Syl. pt. 1, *Hayseeds, Inc. v. State Farm Fire & Cas.*, 177 W. Va. 323, 352 S.E.2d 73 (1986).

48. The Bank is entitled to recover the benefits due and owing under the Policy, as well as additional extra-contractual damages under *Hayseeds* and its progeny for Everest's actions.

## COUNT IV – UTPA VIOLATIONS UNDER WEST VIRGINIA CODE § 33-11-4

49. The Bank realleges paragraphs 1-48 as if set forth and fully incorporated herein.

50. Everest had adequate notice of the Bank's Claim and had adequate time to investigate any insurance coverage issues.

51. At all times relevant herein, Everest denied, delayed, delayed, or otherwise refused payment of the Claim of the Bank and continues to do so, and it failed to conduct a prompt and reasonable investigation based on all available information, thereby violating applicable consumer protection statutes and regulations, including West Virginia Code § 33-11-4(9)(d).

52. At all times relevant herein, Everest failed to adopt and/or implement reasonable standards for the prompt investigation of the Bank's Claim, and this constitutes a direct violation

of applicable consumer protection statutes and regulations, including West Virginia Code § 33-11-4(9)(c).

53. At all times relevant herein, Everest refused to acknowledge and act reasonably and promptly upon communications with respect to the Bank's Claim, thereby violating applicable consumer protection statutes and regulations, including West Virginia Code § 33-11-4(9)(b).

54. At all times relevant herein, Everest refused to effectuate a prompt, fair, and equitable settlement of the Bank's claims, even though liability was reasonably clear, thereby violating applicable consumer protection statues and regulations, including West Virginia Code § 33-11-4(9)(f).

55. By refusing to pay the Bank's Claim under the Everest Policy, Everest has compelled the Bank to retain counsel and institute litigation in order to recover amounts due under the Everest Policy, thereby violating applicable consumer protections and statues and regulations, including West Virginia Code § 33-11-4(9)(g).

56. Everest has yet to provide a reasonable explanation of the basis in the Policy in relation to the facts or applicable law for denying, failing to accept, and/or pay the Bank's Claim or for making a fair offer of settlement, thereby violating applicable consumer protection statutes and regulations, including West Virginia Code § 33-11-4(9)(n).

57. Everest failed to promptly provide reasonable assistance and instructions to the Bank for complying with Everest's applicable policy conditions and requirements, thereby violating applicable consumer protection statutes and regulations, including West Virginia Code of State Regulations § 114-14-6.1.

58. Everest's conduct, as described herein, is part of a general business practice and constitutes unfair claims settlement practices in violation of applicable consumer protection statutes and regulations governing the business of insurance.

59. As a direct and proximate result of Everest's violations of applicable consumer protection statutes, the Bank has suffered actual damages due to the loss of insurance benefits rightfully owed under the Everest Policy; annoyance, inconvenience, and aggravation; continuing economic harm; and has been forced to incur attorney's fees and costs associated with pursuing its claims through the present action in order to recover the insurance proceeds Everest owed the Bank under the Everest Policy.

## PRAYER FOR RELIEF

60. The Bank realleges paragraphs 1-59 as if set forth and fully incorporated herein.

61. WHEREFORE, the Bank demands judgment against Everest as follows:

62. The Bank demands declaratory judgment against Everest that the Bank is entitled to coverage under the Everest Policy.

63. The Bank demands judgment against Everest that the Bank is entitled to full coverage under the Everest Policy for the covered Losses that constitute the Bank's Claim under the Everest Policy.

64. The Bank demands equitable relief, together with interest, both pre and post judgment, costs, reasonable attorneys' fees, economic damages, damages related to aggravation and inconvenience, extra-contractual damages, and such other relief as the Court deems just and proper.

**THE BANK OF MINGO DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE**

Dated this 24th day of May 2024.

                 **Bank of Mingo,**

                 **By Counsel,**

_/s/ Stuart A. McMillan_
Stuart A. McMillan (WVSB #6352)
Joshua A. Lanham (WVSB #13218)
BOWLES RICE LLP
Post Office Box 1386
600 Quarrier Street
Charleston, West Virginia 25325
(304) 347-1100
Fax: (304) 347-1746
smcmillan@bowlesrice.com
jlanham@bowlesrice.com